# United States Court of Appeals
## For the First Circuit

No. 07-1146

IN RE NORTHWOOD PROPERTIES, LLC,
Debtor

SIDNEY BOURNE; CLAUDIO M. DELISE; RALPH S. TYLER,

Plaintiffs, Appellees,

v.

NORTHWOOD PROPERTIES, LLC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge, and
Lynch, Circuit Judge.

Jeffrey D. Ganz and Riemer & Braunstein LLP on brief for appellant.
Robert J. Galvin, Christopher J. Marino, and Davis, Malm & D'Agostine, P.C. on brief for the Abstract Club and the Real Estate Bar Association for Massachusetts, Inc., amici curiae.
Sidney Bourne, Claudio M. Delise, and Ralph S. Tyler on brief pro se.

November 30, 2007

**LYNCH**, **Circuit Judge**.    In this case we interpret Massachusetts General Laws chapter 183A, section 5, which governs condominium owners' rights and powers vis-à-vis the phased development of condominium projects.    We reverse the district court, In re Northwood Props., LLC, 356 B.R. 81 (D. Mass. 2006), because its statutory interpretation was in error.

Northwood Properties, LLC, ("Northwood") is the developer of Northwood at Sudbury, a partially completed condominium project. Northwood is currently attempting to reorganize under Chapter 11 of the Bankruptcy Code.    At every turn, its reorganization has been opposed by three individuals: Sidney Bourne, Claudio Delise, and Ralph Tyler.    Bourne and Delise are residents of Northwood at Sudbury; all three are creditors of Northwood.    Bourne and Delise vigorously oppose Northwood's attempt to extend its rights to finish developing Northwood at Sudbury, rights which were set by the original master deed to expire in 2005.    Without the extension of these rights, Northwood's efforts at reorganization will likely fail.

This discrete dispute turns on a provision in the Massachusetts condominium statute which provides that a condominium owner constructively consents to the addition of further units "if the master deed at the time of the recording of the unit deed . . . made possible an accurate determination of the alteration of each unit's undivided interest that would result therefrom."  Mass. Gen.

Laws ch. 183A, § 5(b)(1). This provision has yet to be interpreted by the Supreme Judicial Court or the Massachusetts Appeals Court.

Further, Bourne, Delise, and Tyler all oppose Northwood's reorganization plan, offering their own in its place. Under their plan, they would take control of the reorganized development company, Bourne and Delise would be paid for their consent to further development, and Tyler would receive a large settlement for his long-running litigation against Northwood at Sudbury. The three appellees also argue that Northwood's final plan denied them a vote in its confirmation by leaving their rights as creditors unimpaired.

The bankruptcy court held that Northwood had successfully extended its development rights; rejected Bourne, Delise, and Tyler's voting complaint; and confirmed Northwood's plan. The district court, sitting as an intermediate appellate court, interpreted section 5 of chapter 183A to hold that Northwood had not successfully extended its development rights. In re Northwood Props., 356 B.R. at 89. Because it remanded the issue of confirmation of Northwood's plan for reconsideration in light of this ruling, it did not consider the voting argument. Id.

We hold that we have jurisdiction over both disputes, hold that the district court's interpretation of the condominium statute was in error, reverse the district court's ruling on the validity of Northwood's development rights, find the district

-3-

court's remand moot on the grounds stated, and affirm the bankruptcy court's confirmation of the reorganization plan.

## I.

Northwood at Sudbury was originally envisioned as a six-building complex that would offer residential care to the residents of its sixty-six condominium units. The master deed for the condominium was recorded on December 9, 1998, following the completion of the first phase of development, which consisted of one twelve-unit building. As the Massachusetts Appeals Court has explained, "[i]n a phased condominium development, groups or stages of units are completed over a period of several years and become part of the condominium by successive amendments to the master deed. 'Phasing' is not a statutory term, but is a usage that has grown out of the general enabling provisions" of the condominium statute. Podell v. Lahn, 651 N.E.2d 859, 860 n.3 (Mass. App. Ct. 1995). The deed allowed for four additional phases of construction to complete the project, but it set those development rights to expire on December 9, 2005.

The master deed was amended on May 20, 2002, to account for the completion of the second phase, which consisted of another twelve-unit building and a clubhouse. Bourne and Delise each purchased a unit built in this second phase. No further phases have yet been undertaken.

In advance of the expiration of its development rights, Northwood negotiated an extension of those rights with the condominium unit owners' association ("Association") in exchange for $700,000.  Even though Northwood had filed for bankruptcy in the interim, twenty unit owners approved the extension, two abstained, and two -- Bourne and Delise -- voted against it.  This eighty-three percent approval was more than sufficient under the master deed to extend the development rights until December 9, 2010.

When Northwood filed for bankruptcy in September 2005, there were five unsecured claims held by non-insider creditors: (1) $50.00 owed to NStar; (2) $50.00 owed to KeySpan; (3) $305.92 owed to GZA GeoEnvironmental; (4) $622,270 allegedly owed to Ralph Tyler; and (5) approximately $1.5 million owed to the Association. Northwood disputed the debt claimed by Tyler; the legitimacy of that claim is still pending before the bankruptcy court.[1]

Bourne and Delise filed a Phasing Rights Motion in Northwood's bankruptcy proceedings in February 2006, seeking a determination that the extension of development rights was not valid without their consent.  In March 2006, Bourne, Delise, and Tyler each purchased, respectively, the NStar debt, the GZA GeoEnvironmental debt, and the KeySpan debt. By becoming creditors

---

[1]    The alleged debt is related to ongoing legal battles over zoning and permitting stretching back to the initiation of the Northwood at Sudbury development in 1998.

of Northwood, they improved their ability to oppose Northwood's Chapter 11 reorganization plan and gained the opportunity to submit their own.

Northwood filed its first proposed reorganization plan in May 2006. Under this plan, the five unsecured, non-insider claims were grouped together and would initially receive approximately five percent of the allowed amount of those claims. Proceeds from either future condominium sales or the sale of Northwood's development rights would then be distributed pro rata among the claims. As relevant here, a claim is impaired under a reorganization plan if the plan does not "leave[] unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." 11 U.S.C. § 1124(1). Because their interests were impaired under this plan, Bourne, Delise, and Tyler had a controlling vote over the plan's confirmation, which they opposed.

Northwood then submitted a revised version of its plan in July 2006. This version grouped the NStar, KeySpan, and GZA GeoEnvironmental debts into a convenience class; these claims, including interest, would be paid in full immediately. Tyler's original claim was placed in its own class and would be paid in full with interest once a final, non-appealable order allowing the claim was entered. This left the Association's claim in its own class, to be paid over time by Northwood's future earnings as under

the first proposed plan. Because the interests of Bourne, Delise, and Tyler were no longer impaired under this plan, their votes were not required for the plan's confirmation. The Association, whose interests remained impaired, voted to accept the plan.

In July 2006, the bankruptcy court denied Bourne and Delise's Phasing Rights Motion, rejecting their argument that, despite the vote of the Association, no development rights could be extended without their specific consent. The court then conducted a confirmation hearing on Northwood's revised plan and approved it. Bourne, Delise, and Tyler objected to the reclassification of claims under the revised plan, arguing that it impermissibly nullified their votes. The court rejected this argument, however, because the revised plan fulfilled all their interests as creditors. Bourne, Delise, and Tyler moved for reconsideration, primarily of the phasing rights issue; the court denied the motion. They then appealed to the district court, which took a different view of the matter than did the bankruptcy court.

Before the district court, Bourne, Delise, and Tyler argued that their Phasing Rights Motion should have been granted and that the revised plan should not have been confirmed. On the confirmation question, they argued in part that the plan was infeasible if Northwood did not have legitimate development rights and in part that Northwood's reclassification of their claims was

an impermissible "gerrymander" meant to deprive them of a say in Northwood's reorganization.

The district court held a hearing on November 16, 2006, which focused on the appellees' Phasing Rights Motion. The court issued its order three weeks later, essentially granting the Phasing Rights Motion and holding that Northwood's development rights had not been legitimately extended. In re Northwood Props., 356 B.R. at 89. It vacated the confirmation of the plan on the grounds that the plan was not feasible without the development rights. Id. In so concluding, the court interpreted the condominium statute as demanding a great degree of precision. That is the first merits issue before us.

Because the court found the revised plan not feasible and thus vacated the plan's confirmation on that ground, the court did not address the reclassification argument. Id. That is the second issue before us.

The district court suggested that Northwood could successfully extend its development rights with less than unanimous consent of the unit owners if the Association first agreed that the percentage interests of the opposed unit owners (Bourne and Delise) in the condominium's common areas would remain unchanged. This, of course, would necessitate a greater decrease in the percentage interests of the remaining owners. Id. at 88.

Upon Northwood's motion, the district court modified its order, remanding the plan confirmation to the bankruptcy court so that Northwood could pursue this suggestion for curing the problem found by the district court. Northwood has appealed to this court both the district court's ruling on the Phasing Rights Motion and its remand of the plan confirmation to the bankruptcy court.

II.

A.      Standard of Review

In an appeal from district court review of a bankruptcy court order, this court independently examines the bankruptcy court's decision, reviewing findings of fact for clear error and conclusions of law de novo. Official, Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1310-11 (1st Cir. 1993). The district court decision is given no deference. Id. at 1311.

B.      Phasing Rights Motion

1.      Appellate Jurisdiction

Appeals in bankruptcy proceedings are governed primarily by 28 U.S.C. § 158, although in Connecticut National Bank v. Germain, 503 U.S. 249 (1992), the Supreme Court clarified that jurisdiction under § 158 was in addition to, not in lieu of, the normal appellate jurisdiction provided by 28 U.S.C. §§ 1291-1292. Id. at 253. Sitting as an intermediate appellate court, the district court exercised jurisdiction under § 158(a)(1) in

reviewing the "final judgments, orders, and decrees" of the bankruptcy court. Both of the bankruptcy court's decisions -- denying the Phasing Rights Motion and confirming the revised plan -- were final as required by § 158(a)(1).

The circuit courts have further appellate jurisdiction over "all final decisions, judgments, orders, and decrees" issued by the district court sitting in its appellate capacity in bankruptcy proceedings. 28 U.S.C. § 158(d)(1); see also 28 U.S.C. § 1291. This limitation on our appellate jurisdiction recognizes that "the 'finality' of a bankruptcy court's decision may be affected by the district court's disposition of the appeal." Bowers v. Conn. Nat'l Bank, 847 F.2d 1019, 1022 (2d Cir. 1988). Requiring the bankruptcy court's decision to be truly final, which requires the district court's appellate review to be final, avoids piecemeal appellate review before this court, thereby conserving judicial resources. In re St. Charles Pres. Investors, Ltd., 916 F.2d 727, 729 (D.C. Cir. 1990). However, "because bankruptcy cases typically involve numerous controversies bearing only a slight relationship to each other, 'finality' is given a flexible interpretation in bankruptcy." In re G.S.F. Corp., 938 F.2d 1467, 1473 (1st Cir. 1991), abrogated on different grounds by Conn. Nat'l Bank, 503 U.S. 249.

The district court's ruling on the Phasing Rights Motion is a final determination under § 158(d). "To be final, a

bankruptcy order need not resolve all of the issues in the proceeding, but it must finally dispose of all the issues pertaining to a discrete dispute within the larger proceeding." Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir. 2004); see also In re G.S.F. Corp., 938 F.2d at 1473; In re Saco Local Dev. Corp., 711 F.2d 441, 444 (1st Cir. 1983). The Phasing Rights Motion is essentially a declaratory action, seeking a judicial determination as to whether Northwood's development rights have been legitimately extended. Although the motion does not finally resolve all disputes between Northwood and Bourne and Delise, it does resolve a discrete dispute that was instigated before Bourne and Delise became creditors of Northwood. That is, it definitively resolves Bourne and Delise's rights as condominium owners, even if not their rights as creditors.[2] We have jurisdiction over this question under § 158(d).

2.    The Condominium Statute

---

[2]    Although the district court remanded the bankruptcy court's ruling on the Phasing Rights Motion, that remand pertained to a purely ministerial task, the entry of an order granting the motion. This does not affect the finality of the district court's determination. See In re Gould & Eberhardt Gear Mach. Corp., 852 F.2d 26, 29 (1st Cir. 1988) ("When a remand leaves only ministerial proceedings, . . . then the remand may be considered final [in terms of § 158(d)]."); see also, e.g., Aegis Specialty Mktg. Inc. v. Ferlita (In re Aegis Specialty Mktg. Inc. of Ala.), 68 F.3d 919, 921 (5th Cir. 1995) (considering "the entry of an order by the bankruptcy court in accordance with the district court's decision" to be only a ministerial proceeding such that the district court's remand was a final order).

Condominiums are governed in Massachusetts by chapter 183A of the Massachusetts General Laws. Chapter 183A "is essentially an enabling statute, setting out a framework for the development of condominiums in the Commonwealth, while providing developers and unit owners with planning flexibility. Such flexibility is particularly important with respect to phased condominium developments where long-term financial and market conditions may be uncertain." Queler v. Skowron, 780 N.E.2d 71, 77 (Mass. 2002) (citation omitted); see also Tosney v. Chelmsford Vill. Condo. Ass'n, 493 N.E.2d 488, 490 (Mass. 1986); Barclay v. DeVeau, 429 N.E.2d 323, 326 (Mass. 1981).

Phasing allows developers to sell units as they are built, which in turn eases construction costs and financing arrangements. The flexibility to revise plans as market and financing conditions change also greatly assists condominium development. The state legislature significantly revised the condominium statute in 1998, adding the key provision in question here and increasing the powers of unit owners' associations vis-à-vis individual unit owners. It did so in recognition of "a shortage of affordable housing stock based upon the expiration of the right to add additional condominium units and land in numerous condominiums created pursuant to chapter 183A." 1998 Mass. Adv. Legis. Serv. 242 (LexisNexis).

We turn to section 5 of chapter 183A with these policy concerns in mind.  Because neither the Supreme Judicial Court nor the Massachusetts Appeals Court has interpreted the relevant provisions of section 5 since it was last amended in 1998, we address the question ab initio.  As with all statutory interpretation questions, we focus on the language of the statute itself.

Section 5(b)(2) describes the authority and powers of a condominium's unit owners' association, which includes the power to "[e]xtend, revive or grant rights to develop the condominium, including the right to add additional units or land to the condominium." Mass. Gen. Laws ch. 183A, § 5(b)(2)(iii).  It is not disputable that the Association's extension of Northwood's development rights met the requirements of section 5(b)(2)(iii).  As required by that provision, the master deed authorized additional units, and the eighty-three percent approval rate by the Association's members of the extension surpassed the seventy-five percent set by the statute as a default percentage.  See id.

The extension of the time to exercise development rights, however, is distinct from the ability to exercise those rights under the statute.  The addition of units reduces the percentage interest each unit owner holds in the condominium's common areas. State law provides some protection for unit owners in this context. Under section 5(b)(1), a unit owner's percentage interest in the

common areas cannot be "materially affected" without his or her consent.

Northwood broadly argues that section 5(b)(2)(iii) operates independently from section 5(b)(1) and that unit owners have necessarily waived their rights under section 5(b)(1) through their acceptance of any master deed. We disagree in light of the language in section 5(b) that "[i]n the event of any conflict between the provisions of this subsection and of the master deed, . . . this subsection shall control."

Nonetheless, state law also provides that the requisite consent can be inferred from the unit owner's acceptance of the master deed if, at the time the unit deed was recorded, the master deed (1) provided for the additional units and (2) "made possible an accurate determination of the alteration of each unit's [percentage] interest that would result" from the construction of the additional units. Id. § 5(b)(1). The master deed in this case clearly provided for additional units. The ability of Northwood to exercise its development rights thus hinges on the interpretation of this second clause, particularly the phrase "an accurate determination of the alteration of each unit's [percentage] interest."

The district court interpreted this phrase too narrowly. On its reading, an "accurate determination" is the same as "precise calculations." In re Northwood Properties, 356 B.R. at 87.

Because the master deed did not make it possible for Bourne and Delise "to calculate precisely what their new percentage interests would be following the completion of any additional phases," the court concluded, Northwood must obtain their express consent before constructing any further units. Id. at 89 (emphasis added).

To impose a requirement of precise calculations of what the new percentage interests would be upon development, however, runs counter to the statute's underlying policies of flexibility and pragmatism as well as the language of related provisions. It is also inconsistent with the approach taken by the state courts in interpreting this statute.

As a matter of statutory construction, section 5(a) is closely related to the provision in dispute here, and that section states that a unit owner's percentage interest "shall be in the approximate relation that the fair value of the unit . . . bears to the . . . aggregate fair value of all the units" at the time the unit deed is recorded. Mass. Gen. Laws ch. 183A, § 5(a). Terms like "approximate" and "fair value" reflect a statutory approach of allowing developers flexibility within a reasonably limited range, not an approach requiring absolute precision. We see no reason why greater requirements for precision would be imposed under section 5(b)(1).

Further, in practice, the district court's reading would tie the hands of developers, making it impossible for them to

respond to changing market conditions. This would seriously jeopardize developers' ability to secure financing to complete projects. This in turn could have an adverse impact on present owners of units. And it implicates the legislature's concern about removing impediments to developing more housing in the Commonwealth. Thus we read the key phrase, "made possible an accurate determination," as not requiring the degree of precision the district court posited.

Our reading is more consistent than that of the district court with the approach taken by state courts in interpreting Chapter 183A. That statute as a whole is an enabling statute. Tosney, 493 N.E.2d at 490. It sets forth minimum requirements but also provides for flexibility. Included in that flexibility, and meant for the benefit of both unit owners and developers, is the ability to adapt the size and scope of a project in response to market conditions by phasing the development over some years. See Queler, 780 N.E.2d at 77; Podell, 651 N.E.2d at 860 n.3.

We need not determine here the bare minimum a master deed need include to satisfy the constructive consent provision of section 5(b)(1). And it is better for the state courts to themselves articulate the correct standard to apply. What was in the master deed in this case, in our view, was enough.

The master deed stated how the percentage interests would be calculated. It explained that the original schedule of

-16-

percentage interests had been calculated "in conformance with Chapter 183A, upon the approximate relation which the fair market value of each Unit . . . bears to the aggregate fair market value of all the Units"; that is, the deed treats "conformance with Chapter 183A" as equivalent to the standard set by section 5(a). In the same paragraph, the master deed states that "such percentage interests [shall be] modified in conformance with Chapter 183A" following the construction of additional phases. Thus Bourne and Delise knew that their percentage interest would continue to track the approximate ratio of the value of their units to the value of all the units.

The master deed also provided enough information about future phases to allow a reasoned and reasonable approximation of what the aggregate fair value might be. There would be at most sixty-six units, the construction of which would be of equal quality to the existing units. The blueprint of the proposed full development, included with the master deed, showed that two additional buildings would have the same footprint as the two existing buildings and that the remaining building would be slightly larger; this implies that the future units would not be grossly disproportional in size to the existing units. The master deed, by definition, cannot precisely predict the future at the time of its execution. It can, however, set forth reliable and

accepted methodologies and provide an accurate description of planned development.

This amount of information is sufficient to allow both the Association and Bourne and Delise to accurately determine how their percentage interests would be affected. They were not caught by surprise or unfairly treated. Bourne and Delise argue that the fact that Northwood and the Association offered two different predictions of their future percentage interests in itself proves that no "accurate determination" was possible, but the very small range between Northwood's prediction of 1.52% and the Association's prediction of 1.43% -- a 0.09% difference -- does not mean that no "accurate" determination was possible.

The master deed "made possible an accurate determination of the alteration of each unit's [percentage] interest that would result" from the completion of further phases. As such, Bourne and Delise consented to the future alteration of their percentage interests when they recorded their unit deeds. Northwood may thus exercise the development rights legitimately extended by the Association under section 5(b)(2)(iii).

C.        Confirmation of the Reorganization Plan

We have jurisdiction, in these circumstances, to reach the issue of the confirmation of Northwood's plan. The district court did not consider two other objections made by Bourne, Delise, and Tyler to that confirmation. As our review of these issues is

-18-

de novo and on the record from the bankruptcy court, we can and do resolve them ourselves. See Advanced Testing Techs., Inc. v. Desmond (In re Computer Eng'g Assocs., Inc.), 337 F.3d 38, 45 (1st Cir. 2003) ("Our review of the district court's decision amounts to review of the bankruptcy court's decision in the first instance."); In re SPM Mfg. Corp., 984 F.2d at 1310-11 ("In an appeal from district court review of a bankruptcy court order, the court of appeals independently reviews the bankruptcy court's decision . . . .") (emphasis added). Given the lengthy history of this dispute and the need to avoid piecemeal litigation, we decline to remand to the district court, with the attendant expense and delay, to address issues fully briefed before us that we can resolve. We turn to the two other objections.

We reject the claim that there has been a violation of the Statute of Frauds. No separate written document was needed as this dispute concerns no sale of real property. See Mass. Gen. Laws ch. 259, § 1 ("[n]o action shall be brought . . . [u]pon a contract for the sale of lands, tenements . . . or of any interest in or concerning them" unless the contract is in writing and signed by the party to be charged).

The appellees' second objection is that they were erroneously grouped into an artificial convenience class in the revised plan in order to orchestrate acceptance of the plan. The bankruptcy court found that "the reclassification improves the

financial position of Bourne, Delise, and Tyler by providing for full payment of their claims and, hence, does not adversely affect them." There was no error, much less clear error, in this finding. Once their interests as creditors are fully protected, Bourne, Delise, and Tyler have no legitimate grounds for objecting to the reorganization plan.

III.

We reverse the decision of the district court, affirm the bankruptcy court's confirmation of the reorganization plan, and remand the case to that court for any further proceedings consistent with this opinion. Costs are awarded to Northwood.